UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LEEDOM FINANCIAL SERVICES, LLC and )
LEEDOM AND ASSOCIATES, LLC, )
)
   Plaintiffs, )
)
v. )
)
PARTNERS LENDING AUTO GROUP, LLC )
d/b/a AUTO FINANCIAL GROUP, PALM )
BEACH LINKS CAPITAL, L.P., RICHARD )
EPLEY and DEDE MURCER-MOFFETT )CASE #: 8:1-cv-00727-VMC-TBM
)
   Defendants. )

## REPLY AFFIDAVIT OF CHRISTOPHER LEEDOM

STATE OF FLORIDA
COUNTY OF SARASOTA

Before me, the undersigned authority, authorized to take and administer oaths in the state and county aforesaid, personally appeared Christopher M. Leedom, President of Leedom and Associates, LLC (LAA) and Leedom Financial Services, LLC (LFS) who, after being duly sworn stated as follows:

1. From July, 2008 through February 15, 2010 LAA and LFS were involved in the numerous litigations with Partner's Lending Auto Group, LLC d/b/a Auto Financial Group (AFG).

2. These cases include <u>Partners Lending Auto Group, LLC d/b/a Auto Financial Group, Dede Murcer-Moffett and Richard Epley v Leedom Financial Services, LLC, Leedom & Associates, LLC and Chris Leedom,</u> Cause No. 2008-39518 pending in the 125th Judicial District Court of Harris County, Texas; <u>Partners</u>



<u>Lending Auto Group, LLC d/b/a Auto Financial Group v Leedom Financial Services, LLC, Leedom & Associates, LLC and Chris Leedom,</u> Case No. 70 148 00515 09 pending with the American Arbitration Association in Houston, Texas; and <u>Leedom Financial Services, LLC and Leedom and Associates, LLC v Partners Lending Auto Group, LLC d/b/a Auto Financial Group, Palm Beach Links Capital, L.P., Richard Epley and Dede Murcer-Moffett</u> Case No. 2010CA1595NC, the predecessor to this action.

3. After countless hours of repeated depositions, tens of thousands of pages of submitted discovery documents, hundreds of hours of written discovery and over $100,000 of legal expense, the Leedom parties suggested and initiated two voluntary, albeit unsuccessful mediations.

4. Following the mediations, settlement discussions ensued. Finally, we were able to reach undesirable, but acceptable, settlement terms to cease all the hostilities and litigation.

5. The terms of this settlement were negotiated by me personally with Jonathan Simon, co-counsel for AFG. The terms of this settlement as reflected in my notes of Friday, February 12th, 2010 were as follows:
   a. An initial payment of $250,000 to be wired within 24 hours of an executed agreement that would be drafted over the weekend.
   b. Four additional payments of $37,500 to be paid at 30 day intervals for four months totaling $150,000.
   c. No admission of liability.

  d. An immediate voiding and termination of all contracts in existence between the parties.

  e. The immediate release of all parties with covenants not to sue.

6. All parties were to execute the settlement agreement immediately upon its completion.

7. The settlement agreement was drafted and finalized on Sunday, February 14, 2010. Opposing counsel was having trouble rounding up signature pages and needed extra time to do as much. We accommodated and gave an extension until February 15th, 2010.

8. I personally the settlement on behalf of all Leedom parties on February 15, 2010. (Exh. B) S ubsequently, I originated and approved the wire within the prescribed period and sent $250,000 to Mr. Daly's escrow account.

9. Co-counsel for the AFG entities was very specific that payments had to be at 30 day intervals. While the language in the actual Agreement was not that specific, I had personally agreed to payments every 30 days. Therefore, 27 days after the first payment was made, we originated the second payment due in the amount of $37,500.

10. We did not discuss, or agree to, making payments so as to actually be received by the AFG entities on or before any particular date.

11. Further, while the parties discussed and agreed that the $250,000 down payment would be made by wire transfer, we did not discuss or reach agreement as to how the subsequent installment payments would be made. The agreement is silent as to payment method for the installment payments.

12. Despite being out of the country, I nevertheless personally approved the wire transfer of the first installment payment on Monday, March 15, 2010. (Exh. C) This authorization, alone, satisfied my obligation under the settlement agreement to commence payment. Nevertheless, I also intended that the wire be effectuated that day.

13. Nevertheless, as a result of the approval being tendered after the Federal wire deadline of 2pm, the wire apparently was queued for delivery on March 16th – only 28 days after the first payment was tendered.

14. As I believe that I was in compliance with the settlement terms, and in fact was making payment sooner than required, I anticipated no difficulty with the March 16th transfer.

15. The morning of March 16, 2010, I specifically watched for the confirmation email that is received when I originate and send a wire. I did, in fact, receive this confirmation when opposing Counsel's bank accepted the wire and confirmed at 8:17am CST on Tuesday March 16, 2010. (Exh D) This was 28 days after the initial payment, and consistent with both the Settlement Agreement and the terms negotiated.

16. Despite timely payment, Mr. Daly (counsel for the AFG parties) rejected the tender, stating payment was late. Mr. Daly purported to return the first Installment payment by mailing back to the Leedom entities a check written that same day (March 16, 2010). Mr. Daly's check has never been cashed.

17. Mr. Daly also immediately attempted to unilaterally reinstate the arbitration by filing a Motion to Compel Arbitration in the aforementioned Texas state court action.

18. The Leedom entities timely Cross-Moved to Stay Arbitration and Adopt/Enforce the Settlement Agreements or, in the Alternative for Return of the Settlement Payments if the arbitration was to proceed.

19. 29 days later on April 14th, 2010 the second installment payment of $37,500 was tendered to Mr. Daly (counsel for the AFG parties) via check delivered by Federal Express. Mr. Daly returned our check.

20. As of the date of this Affidavit I have caused $325,000 to be paid consistent with the terms of the Settlement Agreement. Mr. Daly, on behalf of the AFG entities, still retains the initial $250,000 and has purported to reinstitute BOTH arbitration and litigation. This is patently unjust.

21. On April 19, 2010 a hearing was scheduled in the Texas state court action on the aforementioned motions. Prior to that hearing, Defendants' co-counsel approached my attorney demanding an additional $400,000 in order to cease litigation. Upon my instructions, she informed him that neither my companies nor I, individually, would be blackmailed into paying for behavior that was already mandated by the Settlement Agreement

22. I was personally in Court on April 19, 2010 when Judge Kyle Carter denied the AFG entities' Motion to Compel Arbitration and the Leedom entities' Cross-Motions to Stay Arbitration and Adopt/Enforce the Settlement Agreements or for Return of the Settlement Payments.

23. The Judge did not address the merits of the motions. Rather, the Judge denied all motions relating to the settlement on the grounds that the court supposedly lacked jurisdiction to consider or enforce the settlement. To be clear, the Judge did not rule on the merits of Plaintiffs' motion that the Settlement Agreement must be enforced because there had been no breach. The Judge felt he could not rule on the status of settlement and merely noted that the last order on the docket directed what he stated was two parties to arbitration. *However, recognizing the injustice of, and need for clarification on, the situation, the Judge expressly gave the parties 90 days before any arbitration hearing were to be held in order to give the parties a chance to have the status Settlement Agreement properly placed before a Court..* Attached as Exh A is a copy of the transcript from the hearing. Exh A pp. 25, 27, 34-35, 48, 55-56 plainly establish that the Court did not rule on the merits of Plaintiff's motion and, instead, just disclaimed jurisdiction to address the issue. Moreover, Exh A pp. 26, 28 37. 42-44, 53 and 55-56 expressly establish that the Court and all parties recognized that the issue of the settlement's vitality (and whether arbitration should be stayed) would need to be raised and resolved in future proceedings – likely in a different court. Indeed, the Texas judge specifically stated that he "imagine[d]" that the dispute would be resolved in federal court! Exh A. p. 53

24. Nevertheless, when the Court asked Defendants' counsel in the April 19th hearing what had happened to the $250,000 he had received on February 16, 2010, he simply responded, "It's gone". (Exh A. p. 45)

25. In a further attempt to resolve this matter, I offered to pay one day's interest and to accelerate all remaining payments. This offer was instantly rejected by the Defendants' counsel, which was quite surprising to me as none of his clients were in the courtroom.

Affiant further sayeth naught.

By: _____   Date: 4/24/10

STATE OF FLORIDA
COUNTY OF SARASOTA

Sworn to (or affirmed) and subscribed before me this 24th day of April, 2010 by Christopher Leedom.

NOTARY PUBLIC

Sign: _____

Print: Debra Dawn

(Seal)

Personally known ✓ ; or produced identification____
Type of identification produced_____



DEBRA DAWN
MY COMMISSION # DD938095
EXPIRES November 03, 2013
(407) 398-0153   FloridaNotaryService.com